Filed 1/18/23; Opinion on rehearing

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SAVE OUR CAPITOL!, | C096617 |
| Plaintiff and Appellant, | (Super. Ct. No. 34202180003716CUWMGDS) |
| v. | |
| DEPARTMENT OF GENERAL SERVICES, | OPINION ON REHEARING |
| Defendant and Respondent; | |
| JOINT COMMITTEE ON RULES OF THE CALIFORNIA STATE SENATE AND ASSEMBLY, | |
| Real Party in Interest and Respondent. | |
| SAVE THE CAPITOL, SAVE THE TREES, | C096637 |
| Plaintiff and Appellant, | (Super. Ct. No. 34202180003717CUWMGDS) |
| v. | |
| DEPARTMENT OF GENERAL SERVICES, | |
| Defendant and Respondent; | |
| JOINT COMMITTEE ON RULES OF THE CALIFORNIA STATE SENATE AND ASSEMBLY, | |
| Real Party in Interest and Respondent. | |

1

APPEAL from a judgment of the Superior Court of Sacramento County, Steven M. Gevercer, Judge.  Reversed in part and affirmed in part.

Brown Rudnick, Stephen R. Cook and Shoshana B. Kaiser for Plaintiff and Appellant Save Our Capitol!.

Brandt-Hawley Law Group, Susan Brandt-Hawley for Plaintiff and Appellant Save the Capitol, Save the Trees.

Rob Bonta, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Russell Hildreth, Supervising Deputy Attorney General, Sierra S. Arballo, Sophie A. Wenzlau and Gwynne B. Hunter, Deputy Attorneys General, for Defendant, Respondent, and Real Party in Interest Department of General Services and Joint Committee on Rules of the California State Senate and Assembly.

This appeal challenges the sufficiency of an environmental impact report (EIR) prepared under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq., statutory section citations that follow are found in the Public Resources Code unless otherwise stated) and CEQA's implementing regulations, the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)).

Defendant Department of General Services and real party Joint Committee on Rules of the California State Senate and Assembly (collectively DGS) prepared the EIR to determine the environmental effects of a project they propose which will significantly affect the California State Capitol Building in Sacramento (Historic Capitol).  DGS will demolish the State Capitol Building Annex attached to the Historic Capitol (the existing Annex) and replace it with a larger new annex building (the new Annex), construct an underground visitor center attached to the Historic Capitol's west side, and construct an underground parking garage east of the new Annex.

Plaintiffs Save Our Capitol! and Save the Capitol, Save the Trees filed petitions for writ of mandate contending the EIR did not comply with CEQA.  The trial court denied the petitions.  Plaintiffs appeal from the judgment.  We have consolidated the appeals for purposes of briefing, argument, and decision.

2

Plaintiffs contend (1) the EIR lacks a stable project description; (2) the EIR does not adequately analyze and mitigate the project's impacts on cultural resources, biological resources, aesthetics, traffic, and utilities and service systems; (3) the EIR's analysis of alternatives to the project is legally deficient; and (4) DGS violated CEQA by not recirculating the EIR a second time before certifying it.

We reverse in part and affirm in part. The EIR's project description, analyses of historical resources and aesthetics, and analysis of alternatives do not comply with CEQA.

FACTS AND HISTORY OF THE PROCEEDINGS

The State Capitol Building Annex Act of 2016 (Gov. Code, § 9112 et seq.) authorized the Joint Rules Committee to pursue renovating or reconstructing the existing Annex. (Gov. Code, § 9112, subd. (a)(1).) The project could also include a visitor center and a relocated and expanded underground parking facility. (Gov. Code, § 9112, subd. (a)(2).) The project could proceed under any delivery method deemed appropriate and advantageous. (Gov. Code, § 9112, subd. (b)(3)(A).)

The Legislature did not exempt the project from CEQA, but it did impose requirements to expedite and restrict judicial review of any CEQA action against the project. (Gov. Code, § 9112, subd. (c); Pub. Resources Code, § 21189.57.) To expedite judicial review, the Legislature required the Judicial Council to adopt a rule of court that would require CEQA actions challenging the project be resolved to the extent feasible within 270 days of DGS's certification of the record of proceedings. (§ 21189.51.) The Judicial Council complied. (See Cal. Rules of Court, rules 3.2220 et seq., 8.700 et seq.)

The Legislature has also prohibited the judicial branch, in granting relief in a CEQA action, from enjoining the project unless the court finds either of the following:

(1) Continuation of the project presents an immediate threat to the public health and safety.

3

(2)  The project or its site contains "unforeseen" important Native American artifacts or "unforeseen" important historical, archaeological, or ecological values that would be materially, permanently, and adversely affected by the project's continuance unless the court stays or enjoins the project.  (§ 21189.53, subd. (a).)

If the court makes either finding, it may enjoin only those specific project activities that present an imminent threat to public health and safety or that materially, permanently, and adversely affect the unforeseen artifacts and values.  (§ 21189.53, subd. (b).)

The project site is primarily contained within the Historic Capitol grounds bounded by 10th Street on the west, L Street on the north, N Street on the south, and roughly the alignment of 12th Street were it to cross Capitol Park east of the existing Annex.

The project consists of three primary components:  (1) demolishing the 325,000 square-foot existing Annex attached to the east side of the Historic Capitol and constructing a new attached Annex; (2) constructing a new underground visitor/welcome center (visitor center) on the west side of the Historic Capitol between the Historic Capitol and 10th Street; and (3) constructing a new underground parking garage. Originally, DGS planned to construct the parking garage south of the Historic Capitol and the Annex between the Capitol building and N Street.  The new Annex would provide up to approximately 525,000 square feet of space, the visitor center would contain 40,000 square feet, and as described in the draft EIR, the parking garage would have approximately 200 parking spaces.  The draft EIR stated the project would require removing an estimated 20-30 trees.

The draft EIR stated the project's objectives were to:

• Provide an accessible, efficient, and safe environment for State employees, elected officials, and the public they serve.

• Integrate the new development with the existing surroundings.

4

- Develop sustainable and energy-efficient facilities.

- Provide modern facilities that meet current construction standards and codes.

- Continue to provide secure parking for legislative and executive branch officials.

- Provide meeting space for legislative and executive functions of sufficient size to support efficient performance of State business and with modern communications technology.

- Continue to provide annex facilities directly adjacent to the Historic Capitol.

- Promote education, hospitality, and a welcoming environment for the visiting public.

At the time of the draft EIR, the project components were not fully designed, especially the new Annex and the parking garage. In the final EIR, DGS explained that the project was designed and delivered in accordance with a construction manager at risk (CMAR) delivery method. This contrasts with a traditional and lengthier three-phased design-bid-build method or the two-phased design-build method. Under the CMAR method, a construction manager is hired to oversee the entire project from preconstruction, design, and bidding through construction. The process begins with a concept that evolves and becomes more detailed and refined as the process progresses.

As a result, the project design became more detailed over time. DGS stated that to evaluate the project under a CMAR scenario and simultaneously satisfy CEQA's requirement for an accurate, stable, and finite project description, it defined with some precision the project's size, scale, footprint, and construction methods even if design details were not available. DGS stated that as designs further developed and changes were made, it would evaluate those revisions in subsequent CEQA analyses.

DGS circulated the draft EIR for public review and comment on September 9, 2019. After the public review period, DGS revised the design of the visitor center with an entry that was significantly different from what was analyzed in the draft EIR.

5

Originally, the underground visitor center would have been accessed by an above-ground elevator and stairway to be built near 10th Street. DGS changed the center's approach and entrance to two, open-air ramps beginning at 10th Street. The opposing ramps will loop at 180 degrees and lead down to a wider central walkway and open-air "lower plaza." At the east end of the lower plaza, doors will lead into a below-grade enclosed security checkpoint and the visitor center.

The ground above the visitor center will be landscaped as an "upper plaza," with the surface elevation raised to be even with the bottom of the first set of remaining west portico steps to the Historic Capitol. The upper plaza will be expanded to the north and south. It will also include a large glass skylight to provide light to and views from the visitor center below and metal safety railings.

As a result of the new visitor center design, DGS revised and, on January 17, 2020, recirculated affected portions of the draft EIR, referred to here as the recirculated draft EIR, to evaluate impacts from the new design. Except for the visitor center design, the project's description and purposes generally remained unchanged from the draft EIR.

DGS developed more detailed designs and modifications after the recirculated draft EIR was circulated, and it evaluated these modifications in the final EIR. It determined the new Annex's exterior design. The new Annex will be physically connected to the historic Capitol. It will have a "Double-T" configuration, and its exterior will be mostly glass. The base of the new Annex will have a non-glass exterior. The glass curtain wall will have glass pleats to reflect the columns in the Historic Capitol's middle section and their spacing. A portion of the glass will be coated with a ceramic coating described as a white frit pattern. This will control heat gain and glare and give the façade a white color to integrate the new Annex more closely with the Historic Capitol.

DGS in the final EIR also changed the location of the underground parking garage. Instead of being built south of the Historic Capitol, the garage will be built east of the

new Annex underneath the 12th Street walkway alignment. Entry and exit ramps will be provided on both L Street and N Street. DGS expanded the project's boundaries along the sides of those streets to accommodate the ramps. DGS also reduced the garage's capacity from 200 vehicles to 150 vehicles.

Additionally, DGS further clarified the project's impacts to trees and landscaping. It estimated that 56 trees will be removed and replaced and 77 will be transplanted. It stated that as the visitor center design progresses, some of the 56 trees planned to be removed may be transplanted instead.

In the final EIR, DGS determined the project modifications would not result in any new significant impacts or substantially more significant impacts than those addressed in the draft EIR and the recirculated draft EIR, and they would not require any new or different mitigation measures. DGS also concluded that none of the modifications constituted "significant new information" requiring recirculation of the EIR. It certified the EIR on July 30, 2021, and approved the project as modified. At the same time, it issued findings of fact and a statement of overriding considerations.

Plaintiffs filed petitions for writ of mandate. The trial court denied the petitions on July 6, 2022 and July 8, 2022.

## DISCUSSION

### I

### *Standard of Review*

We review an agency's compliance with CEQA for abuse of discretion. (§§ 21167, 21168.5; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*).) An abuse of discretion occurs if the agency has not proceeded in a manner required by law or if the agency's determinations are not supported by substantial evidence. (*Ibid.*)

7

We determine abuse of discretion using different standards depending on the nature of the alleged CEQA violation.  We determine de novo whether the agency has complied with the correct procedures, " 'scrupulously enforc[ing] all legislatively mandated CEQA requirements.' " (*Vineyard, supra*, 40 Cal.4th at p. 435, quoting *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564.)

We review the agency's substantive factual decisions for substantial evidence.  In doing so, we " 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " (*Vineyard, supra*, at p. 435, quoting *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights I*).)

When determining whether an EIR's discussion of potentially significant effects is sufficient, the "ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' (*Laurel Heights I, supra*, 47 Cal.3d at p. 405.)" (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 (*County of Fresno*).)  This inquiry presents a mixed question of law and fact which is generally subject to independent review.  (*Ibid*.)  To the extent this mixed question "requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted." (*Ibid*.)

II

*Project Description*

Plaintiffs contend the EIR lacks a stable project description.  They argue the changes made to the project in the final EIR rendered the EIR's project description inadequate, unstable, and vague in violation of CEQA.  By not disclosing the new

8

Annex's glass exterior until releasing the final EIR, DGS allegedly denied the public the opportunity to comment on the glass exterior's compatibility with the Historic Capitol. DGS then failed to analyze meaningfully whether the glass exterior was compatible with the Capitol's historic characteristics.

Similarly, plaintiffs argue that changing the parking garage's location in the final EIR prevented adequate evaluation of the project's true impacts and related potential mitigation measures and alternatives. Plaintiffs claim that because the parking garage will no longer be built on the Historic Capitol's south side, the EIR should have considered as an alternative moving the visitor center from the west side to the south side to reduce the project's impacts on the Historic Capitol's west façade and the West Lawn.

Plaintiffs also claim the project description was inadequate because it did not disclose temporary construction exclusion areas. The recirculated draft EIR stated that space within temporary construction exclusion areas could be used as staging and storage areas for construction trailers and equipment. It did not, however, disclose the locations and sizes of these areas, thereby precluding meaningful analysis of the impacts staging areas may create.

Additionally, the draft EIR states that the plan to increase the Annex's size by 200,000 square-feet would not increase the number of employees working on site. Plaintiffs contend this assertion is unsubstantiated, and the EIR does not consider environmental impacts that will result from what they believe will be a likely increase in the Annex's occupancy.

A.    Background

In the draft EIR, DGS stated that without detailed information on the new Annex's exterior appearance and how it would integrate with the Historic Capitol, and without the parking garage's specific location and footprint, the project's impacts on historical architectural resources, and in particular the Historic Capitol, "cannot be fully

9

confirmed." When DGS fully developed the new Annex's and the parking garage's designs, it would determine whether additional CEQA documentation had to be prepared.

The draft EIR described the project as set forth above. It explained the project's purposes and objectives, its location, and its phased construction. It showed the general envelope being considered for the parking garage between the Historic Capitol's south side and N Street. The project description also stated that "the aesthetics and materials of the new Annex would be developed to be consistent and sympathetic with the Historic Capitol to create a 'One Building' feel for the Capitol. Building materials for the Annex would be selected for durability, quality, and consistency with the Historic Capitol."

The recirculated draft EIR contained a revised project description. Much of the revisions described the visitor center's new design. However, the revised project description repeated the description of the new Annex and the parking garage contained in the draft EIR, including that the new Annex's aesthetics and materials would be consistent with the Historic Capitol to create a " 'One Building' feel," and its building materials would be selected for consistency with the Historic Capitol. The new Annex would be "styled as a 'one-building' design . . . ."

The final EIR announced for the first time the new Annex's exterior design and the parking garage's new location. The footprint of the new Annex would be a "Double T" configuration, appearing from above as if a letter "T" was immediately above another letter T, and the bottom of the lower "T" was attached to the Historic Capitol. The building's height would be no taller than the Historic Capitol's parapet and/or the base of its dome.

The new Annex's exterior would be a "pleated glass design." The design would maximize the availability of natural light and improve working conditions for building occupants. DGS stated the design will be compatible with but not identical to the Historic Capitol. The desire to maximize available natural lighting acknowledged present-day science regarding the importance of natural light to the building occupants'

10

health and well-being.  DGS stated in the Final EIR's aesthetics analysis that the pleated glass design was intended to provide a modern building consistent and sympathetic with the Historic Capitol, and it was "intended to speak to the transparency of the State government, to bring daylight into the building, and to provide windows for views to the outside throughout the Annex."

DGS stated that features of the new design were sympathetic to the Historic Capitol.  Like the Capitol, the Annex would be broken into three architectural components, a base, a middle, and the top or balustrade.  The base would be made of materials other than glass and would match the Historic Capitol's base.  The glass curtain wall would have glass pleats of roughly the same spacing and width as the Historic Capitol's columns in its middle section.

Unlike the previous EIRs, the final EIR specified that it was the "interior quality" of the new Annex's spaces which would be designed to create a "One-Building" feel for occupants as they moved throughout the Capitol.

The final EIR also stated the underground parking garage would be built east of the new Annex underneath the 12th Street walkway, not south of the Historic Capitol as originally planned.  DGS proposed the new location to reduce the project's impact on trees and landscaping in Capitol Park.  The new design would accommodate 150 vehicles, not the 200 as originally planned.

B.     <u>Analysis</u>

An EIR must contain an accurate, stable, and finite project description.  (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199.)  Such a project description "is the sine qua non of an informative and legally sufficient EIR."  (*Id*. at p. 193.)[1]  The

---

[1]    Sine qua non means an "indispensable condition or thing; something on which something else necessarily depends." (Black's Law Dist. (11th ed. 2019).)

description must include the project's precise location and boundaries; a statement of the project's objectives and underlying purpose; a general description of the project's technical, economic, and environmental characteristics; and a statement describing the EIR's intended use. (Guidelines, § 15124, subds. (a)-(d).) Whether the EIR contains an accurate and stable project description is a question of law subject to de novo review. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332 (*South of Market*); accord *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 738.)

An accurate and complete project description is necessary for an intelligent evaluation of a project's potential environmental impacts. (*Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156, 1171; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 730.) It must contain sufficient information to understand the project's environmental impacts. (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 28.) "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance." (*County of Inyo, supra*, 71 Cal.App.3d at pp. 192-193.)

The requirement for a stable project description does not preclude the project from changing while undergoing environmental review. CEQA "is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal." (*County of Inyo, supra*, 71 Cal.App.3d at p. 199.) Thus the description may provide "for flexibility needed to respond to changing conditions and unforeseen events that could possibly impact the [p]roject's final design." (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1053.)

12

At issue here is how much may a project develop or change after the draft EIR is circulated before the project description is no longer accurate, stable, and finite. CEQA does not answer that question, and the parties have cited no reported authorities that address the issue directly. Of note, the adequacy of an EIR's project description has often been decided outside of claims that the new information triggers recirculation of the EIR. (See *Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1185, fn. 6 and cases cited (*Southwest*).)

For us, the governing principal is whether the project description may have thwarted the public's ability to participate in the process and comment meaningfully on the EIR. Inadequate or unstable descriptions of the project may mislead the public and thwart the EIR process. (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 656.) "A project description that gives conflicting signals to decision makers and the public about the nature of the project is fundamentally inadequate and misleading." (*South of Market, supra*, 33 Cal.App.5th at p. 332.) "A curtailed, enigmatic or unstable project description draws a red herring across the path of public input." (*County of Inyo, supra*, 71 Cal.App.3d at p. 198.)

The authority closest to our set of facts is *Southwest, supra*, 76 Cal.App.5th at page 1173. There, the court of appeal determined an EIR's project description did not violate CEQA even though the city approved an alternative that was not analyzed in the EIR. (*Id*. at pp. 1162-1163.) The developers in that case proposed a mixed-use commercial and residential development. (*Id*. at p. 1163.) Originally, the project would consist of seven buildings. Two seven-story buildings would have 422 residences (387,000 square feet), and the other five one-and two-story buildings would provide 200,000 square feet of commercial space. (*Ibid*.) The draft EIR analyzed this and a range of smaller alternatives. (*Id*. at p. 1164.)

The final EIR retained the original project description, but it considered a new alternative. (*Southwest, supra*, 76 Cal.App.5th at p. 1165.) Under the new alternative,

13

the project would consist of 675 residential units (615,000 square feet) and 60,000 square feet of office space. The buildings would be constructed in different locations on the site than originally planned. (*Id.* at pp. 1165-1166.) City staff, however, recommended that the city approve a smaller version of the new alternative which had not been reviewed in any of the project's EIRs. (*Id.* at p. 1166.) The recommended project would consist of four buildings. Two six- and seven-story buildings would provide 623 residential units (515,570 square feet) and two one-story buildings would provide 60,000 square feet of commercial space. The city approved the revised project recommended by its staff. (*Id.* at pp. 1166-1167.)

The plaintiffs in *Southwest* contended the EIR violated CEQA for not containing an adequate project description. (*Southwest, supra*, 76 Cal.App.5th at p. 1167.) None of the EIRs described the approved project. (*Id.* at pp. 1167-1168.) The court of appeal determined the project description satisfied CEQA: "Although the [r]evised [p]roject was not publicly vetted, it was not so significantly different from the project alternatives in the [draft EIR] to conclude the project definition was unstable." (*Id.* at p. 1181.)

In *Southwest*, from inception through approval, the project was a mixed-use commercial/residential project on a defined project site. (*Southwest, supra*, 76 Cal.App.5th at p. 1179.) The only changes involved the composition and ratio of the residential to commercial footprint. (*Ibid.*) The project's overall size and physical layout remained consistent, and the site remained the same. (*Ibid.*) Although the approved project had a different mix of residential and commercial uses than the alternatives evaluated in the draft and final EIRs, the approved project's number of residences was less than the number of residences in the new alterative set forth in the final EIR. (*Id.* at p. 1180.) Under those circumstances, the project definition was sufficiently accurate and stable. (*Ibid.*) "[C]onsideration of additional alternatives after a draft EIR is circulated does not render a project description unstable." (*Id.* at p. 1181.)

14

Much of the reasoning of *Southwest* applies here. The recirculated draft EIR contained the elements of a project description required by CEQA. (Guidelines, § 15124, subds. (a)-(d).) It described and depicted in maps the project's location and boundaries. It set forth the objectives DGS sought to obtain by the project, including the project's purpose and benefits. The approved project retained the same components as originally planned.

Under *Southwest*, moving the underground parking garage from the south side to east of the Annex was not the type of changed project description that thwarted CEQA's purposes. It was an original project component and was consistent with the project's objectives. It also was smaller than originally planned. (We will address in our discussion of the EIR's alternatives section plaintiffs' claim that moving the parking garage required DGS to consider as an alternative moving the visitor center to the Historic Capitol's south side.)

At least one critical difference, however, exists between this case and *Southwest*. This case concerns significant impacts to a treasured historical resource, the Historic Capitol. An obvious and key requirement for determining a project's impact on a historical resource is the project's appearance. (See *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 577 ["Courts have also recognized that aesthetic issues" to be considered and properly studied under CEQA "include impacts on public and private views and on the historic character of the project site and surrounding area"].) DGS stated in the draft EIR that it could not fully evaluate the new Annex's impact to the Historic Capitol without knowing the new Annex's exterior design. While recognizing the difficulties the absence of an exterior design posed, the project descriptions in the draft and recirculated draft EIRs did not describe the exterior design. Instead, they broadly stated the new Annex's aesthetics and materials would be consistent and sympathetic with the Historic Capitol and would create a "one-building" feel.

15

The project description changed significantly in the final EIR, particularly as viewed as a factor for determining the project's impact on a historical resource. The new Annex will have a glass exterior. A glass exterior is so different from the Historic Capitol that DGS no longer stated the new Annex's materials would be consistent with the Historic Capitol. Instead, they would be "compatible." DGS clarified that it sought to create a "One Building" feel within the new Annex's *interior* spaces for the occupants as they move through the Capitol. Moreover, a primary purpose for the glass exterior design was the building occupants' health and well-being and maximizing natural light in the new building. Although the project's objectives included providing a safe environment for building occupants, neither of the two prior EIRs stated that occupant health and maximizing natural light would drive the new Annex's exterior design.

Because the changed project description happened in the final EIR, the conflicting descriptions in the earlier EIRs may have misled the public about the nature of the Annex's design and adversely affected their ability to comment on it. When they commented on the earlier EIRs, the public believed only that the new Annex's design and materials would be consistent with the Historic Capitol and create a "one-building" feel. When the final EIR disclosed the actual design of a glass curtain, the public was foreclosed from commenting meaningfully on the glass exterior's impact on the Capitol. Providing such conflicting descriptions to the reviewing public of such a key project element for purposes of determining the project's impact on a historical resource is inadequate under CEQA. The unstable description of the new Annex's exterior design literally drew "a red herring across the path of public input." (*County of Inyo, supra*, 71 Cal.App.3d at p. 198.) It prevented the people from commenting on significant environmental effects on what is truly the people's capitol.

DGS argues the project description became more detailed as the CMAR process proceeded but it was always sufficient to perform an informed analysis. We have rejected the last point as to the new Annex's exterior design. The point contradicts

16

DGS's admission in the draft EIR that it could not meaningfully analyze the project's impact on historical resources without knowing the new Annex's exterior design. Nowhere does DGS explain how it or any member of the public could meaningfully analyze the new Annex's impact on the Historic Capitol as a historic resource without knowing what the Annex would look like. Indeed, a project's compatibility with a historical resource "is properly analyzed as an aesthetic impact." (*Protect Niles v. City of Fremont* (2018) 25 Cal.App.5th 1129, 1134.)

Furthermore, DGS cites no CEQA authority addressing how CEQA may apply to or be modified for a project whose design occurs during environmental review. Neither we nor CEQA attempt to tell DGS what delivery method it must use to produce the project. But whether CMAR or some other method is chosen, that method must comply with CEQA. It does not drive CEQA. The public cannot be denied its opportunity to participate meaningfully in the CEQA process merely because the project's design and delivery method is dynamic and fluid.

DGS claims the project description complied with CEQA because the recirculated draft EIR identified glass as one of the potential materials for the Annex, and because the final EIR meaningfully analyzed whether the glass design was compatible with the Capitol building's historic characteristics. Whether the final EIR analyzed the glass design does not address whether the project description adequately provided the public a meaningful opportunity to comment on the project's impacts.

As for the recirculated draft EIR, the discussion DGS references is in that document's discussion of aesthetics. The relevant passage states: "Daytime glare could be produced by the increased amount of surface area resulting from the new Annex, which could reflect or concentrate light. However, appropriate building materials, such as natural stone, precast concrete panels, clear or lightly tinted glass, stainless steel, anodized aluminum, factory-coated metal, and composite panels, would be used. All components of the project would avoid using materials such as dark-tinted or highly

17

reflective glass; materials that can generate substantial glare; painted wood, stucco, and other lightweight commercial materials; or field-painted ferrous steel or sheet metal. Although energy performance criteria encourage the use of reflective glass in architectural design to reduce penetration of solar radiation into the building interior, it would be avoided to prevent exterior reflections."

We do not think the public would infer from this paragraph that the new Annex's exterior would be a glass curtain. Moreover, none of this discussion addresses the impact any of the named materials may have on the Historic Capitol as a historic resource or provides the public a meaningful basis on which to discuss the impact the actual exterior of the new Annex will have on the Capitol. That information surfaced only in the final EIR when DGS changed the project description, and the public had no opportunity to comment on such a significant project element.

As for plaintiffs' remaining contentions, we agree with DGS that they do not establish an inadequate project description. Regarding temporary construction exclusion areas, the recirculated draft EIR's project description stated that any space within temporary construction exclusion areas could be used for staging. The available space, however, would be limited as necessary to protect trees and other Capitol Park features to be preserved during construction. As those spaces would not affect protected resources, and additional protective measures would be taken in the EIR to protect retained trees, as we discuss below, the project description was not required to be more specific on this issue than it was.

Plaintiffs question the project description's assertion that, despite the new Annex being 200,000 square feet larger than the current Annex, the number of employees working on site would not increase. Plaintiffs assert this statement is unsubstantiated, but they have provided no evidence questioning the statement's accuracy. Their speculation does not determine the accuracy of the project description. As we discuss below in our discussion on traffic impacts, substantial evidence supports DGS's assertion.

18

We conclude that the EIR's project description satisfied the demands of CEQA except with its description of the new Annex's exterior design. DGS did not comply with CEQA's requirements when it significantly changed the project description of the new Annex's exterior design in the final EIR to the detriment of public participation and informed decision-making on the project's most controversial aspect—its impact on historical resources.

III

*Analysis of Impacts*

Plaintiffs contend the EIR does not analyze adequately the project's impacts on cultural or historic resources, biological resources, aesthetics, traffic, and utilities and service systems. We address each impact.

A.    Cultural resources

DGS concluded the project's impacts on historical resources was significant and unavoidable. It adopted findings and a statement of overriding considerations describing why it nonetheless approved the project. Plaintiffs contend the findings and statement of overriding considerations are legally inadequate because they are based on a flawed analyses of the project's impact on historical resources. We include in this argument plaintiffs' claim that the EIR did not adequately analyze the Annex glass exterior's impacts to historical resources.

Plaintiffs also assert the EIR did not adequately evaluate how the project's impacts on trees will affect Capitol Park's historic landscape and the Capitol complex's historic integrity. They argue that because many of Capitol Park's trees have historical and biological significance, the EIR must identify specific trees the project will impact and the severity of those impacts. We will address this argument in our discussion on the EIR's evaluation of impacts to biological resources.

19

1.      Background

The Historic Capitol, the existing Annex, Capitol Park, and a small building in Capitol Park known as the Insectary from the State Capitol Complex.  The State Capitol Complex is considered a CEQA historical resource because it is listed on the National Register of Historic Places (National Register) and thus eligible for listing on the California Register of Historic Resources.  (Guidelines, § 15064.5, subd. (a)(1).)  A project effect that may cause a substantial adverse change in the significance of a historical resource is by definition a project that may have a significant effect on the environment.  (Guidelines, § 15064.5, subd. (b).)  A substantial adverse change in a historical resource's significance means physical demolition, destruction, relocation, or alteration of the resource or its immediate surrounding such that the resource's significance would be materially impaired.  (Guidelines, § 15064.5, subd. (b)(1).)  A historic resource's significance is materially impaired when a project, among other things, demolishes or materially alters in an adverse manner the resource's physical characteristics that convey its historical significance and justify the resource's inclusion in the California Register of Historical Resources.  (Guidelines, § 15064.5, subd. (b)(2)(A).)

Under these definitions, the project may have significant effect on the environment.  DGS was thus obligated to identify feasible measures to mitigate significant adverse changes in the State Capitol Complex's significance.  (Guidelines, § 15064.5, subd. (b)(4).)

The EIR discussed the extent to which the project's three components contributed to the project's significant effect on the State Capitol Complex as a historical resource and proposed five measures to mitigate the impacts.

20

a. <u>Visitor center</u>

The recirculated draft EIR explained the new visitor center design's impact on the State Capitol Complex. The revised design of the underground visitor center, with its open-air entry ramps and lower plaza and its raised upper plaza, will require recontouring the existing West Lawn's slope to accommodate the ramps and two plazas. This deviates from the existing three level plaza with two sets of stairs between sidewalk level and the west portico steps. Constructing the center will cause ground-borne vibration that could physically damage the Historic Capitol. Expanding the upper plaza to the north and south will reduce the amount of present lawn panels. The inset center lawn panels will be removed. The new hardscape also has the potential to displace or damage current trees that contribute to the West Lawn's historical significance, including the north/south monocultural rows of southern magnolias and deodar cedars. The design could change the character-defining vista up and down Capitol Mall toward the Capitol building.

The recirculated draft EIR states the new visitor center entrance and underground space "would create the most substantial change to the western entrance of the Capitol Building and the western blocks of Capitol Park since the building's completion in 1874. Construction of the new visitor/welcome center would alter historic features of the West Lawn landscape by interrupting the stepped terracing of the West Lawn, the north/side aligned tree rows, and pedestrian circulation paths; altering the spatial organization of the West Lawn and related ratio of softscape and hardscape elements; and removing portions of the perimeter pathways and palm trees. [¶] . . . [¶]

"Overall, the new visitor/welcome center would alter historic landscape features of the West Lawn of the Capitol and reduce the ability of the resource to communicate its period of significance. The proposed project would introduce a large, modern intrusion into the historic landscape, which would eradicate almost one-third of the West Lawn's character-defining features, such as historic circulation, portions of its vegetation, the

21

spatial organization, and the topography.  Therefore, this change would contribute to a *significant impact* on the historical resource."

                  b.        <u>Annex</u>

Demolition of the existing Annex would be a major contribution to the project's significant effect on historical resources.  It would permanently and completely remove part of the building that anchors California's seat of government.  Demolishing the Annex would require removal of some landscape, including the removal of commemorative trees, plantings, or other types of memorials (collectively memorials).  Demolition could also inadvertently damage memorials.  Loss of memorials would contribute to the significant impact to the State Capitol Complex.

The larger new Annex would change the exterior, alter the viewshed of the Historic Capitol from Capitol Park and other vantage points, alter the park's plantings, and transform circulation patterns.  Those changes, in the absence of detailed design drawings, could impair characteristics that qualify the State Capitol Complex for listing on the National Register and impair its ability to convey its historical significance by introducing a building that would be incompatible with and detract from the Historic Capitol.  Construction activities could include vibration levels that could damage the Historic Capitol.  These actions would contribute to the significant impact on the historical resource.

                  c.        <u>Parking garage</u>

Constructing the underground parking garage could create vibration levels that could damage the Historic Capitol.  It could also result in the removal or inadvertent damage to memorials.  These actions would contribute to the significant impact on the historical resource.

The recirculated draft EIR summarized:  "The combination of the complete physical demolition of the Capitol Annex, the changes to the historical integrity of setting

22

and association caused by the introduction of the new visitor/welcome center, the potential for vibration damage during construction activities, the introduction of a new modern building, and physical changes to Capitol Park including introduction of the visitor/welcome center, which would include noticeable changes to the West Lawn's characteristic topography, pedestrian circulation, vegetation, and vistas of the west entrance to the Capitol building, as well as removal of or damage to memorials, and reconfiguration of pedestrian and vehicular circulation systems in the landscaping surrounding all elevations of the Capitol Building, together would result in a substantial adverse change per State CEQA Guidelines Section 15064.5(b)(2)(A) because they would materially impair physical characteristics of the State Capitol Complex that help convey its historical significance and qualify it for listing in the [National Register]. Therefore, the project would result in a significant impact on the State Capitol Complex historical resource."

### d.     Mitigation measures

To mitigate the significant impacts, the EIR proposes five mitigation measures, as modified in the final EIR.

Mitigation measure 4.12-4a requires DGS to contract with historic preservation specialists to prepare a historic structure report in accordance with National Park Service Preservation Briefs. The report will provide baseline information for protecting the Historic Capitol from damage and will inform development of a compatible design for the Annex. The report will include treatment measures in conformance with the Secretary of the Interior's Standards for the Treatment of Historic Properties (SOIS) and the California State Historic Building Code. The report will identify the buildings' historic preservation objectives, and DGS will ensure those objectives seek to meet SOIS

and are incorporated into the project's design and construction. DGS will approve the report prior to the completion of schematic designs.

Under mitigation measure 4.12-4b, DGS will seek feasible means to salvage and reuse character-defining features of the State Capitol Complex that will be removed, including features from the West Lawn. If the salvaged materials cannot be reused as part of the project or incorporated into an interpretive program, DGS and other state agencies will develop a plan to store them.

Mitigation measure 4.12-4c requires DGS and SOIS-qualified consultants to develop an interpretive program to commemorate the continuous development of the State Capitol Complex. The program should result in a permanent exhibit in the State Capitol Complex that will be publicly accessible.

Mitigation measure 4.12-4d requires DGS and landscape specialists to develop a landscape treatment report for protecting memorials in accordance with National Park Preservation Briefs and SOIS. The report will identify those contributing landscape features that will be removed or could be damaged by construction, and it will establish specifications for protecting, restoring, replacing and/or relocating those features as close to their original location as feasible. It will also identify the distance thresholds at which construction activities may damage contributing landscape features.

Under mitigation measure 4.12-4e, DGS and architectural and engineering specialists will prepare a plan for protecting, monitoring, and repairing inadvertent damage to the Historic Capitol. Protection measures would be developed in consultation with the Historic State Capitol Commission. Inadvertent damage will be repaired in accordance with SOIS.

Implementing these measures will reduce impacts and compensate for those which cannot be avoided. However, even with these measures, the project impact on the State Capitol Complex would remain significant and unavoidable "because the Capitol Annex, which represents approximately half of [the] monumental building in the [National

24

Register]-listed complex, would be permanently and completely destroyed, and the West Lawn of Capitol Park would be intensely modified, to the point of potentially not conveying its period of significance."

### e. Final EIR's analysis

After describing the new Annex's exterior design and the parking garage's changed location, the final EIR considered whether these modifications further affected the project's impact on the State Capitol Complex as a historical resource. It concluded they did not. The impacts from the Annex's design would not differ from those impacts disclosed in the recirculated draft EIR except that the design "clarifies the extent to which the appearance of the new Annex is both different from, and sympathetic with the Historic Capitol."

The design "would continue to change the exterior of the Historic Capitol building, alter character-defining landscape features of Capitol Park, and transform interior and exterior circulation patterns. These changes would impair the characteristics that qualify the State Capitol Complex for listing in the [National Register], which in turn would impair its ability to convey its historical significance." Construction impacts would be the same as previously analyzed. Although the modifications would not increase the severity of the impact to the State Capitol Complex and the five mitigation measures as modified in the final EIR would still be imposed, the impact remained significant and unavoidable.

### 2. Analysis

Plaintiffs bore the burden of establishing the inadequacy of the EIR's analysis of impacts. (*Center for Biological Diversity v. California Department of Conservation* (2019) 36 Cal.App.5th 210, 243 (*Center for Biological Diversity*).) They assert the analysis of impacts on historical resources is deficient, and thus the findings and statement of overriding considerations are deficient, because of "the numerous defects in

25

the EIR discussed *ante*" in their opening brief. Those portions of plaintiffs' brief argued the final EIR should have been recirculated (an issue we take up later), the project description was unstable, and the alternatives analysis was inadequate (another issue we take up later). Plaintiffs state, as an example, that after modifying the project in the final EIR after the comment period had expired, DGS left "numerous potential impacts, mitigation measures, and alternatives unstudied," resulting in the findings and statement of overriding considerations being based on a flawed foundation. Plaintiffs offer no further argument for why the analysis of historical resource impacts was deficient.

We agree with plaintiffs that the historical resource impacts analysis is deficient to the extent it does not account for public comment on the new Annex's exterior design disclosed in the final EIR. A project description that omits integral components of the project may result in an EIR that does not adequately disclose all the project's impacts. (See *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829 [omission of water delivery facilities needed for sand and gravel mine rendered EIR deficient].)

Because the public did not have an opportunity to comment on the Annex's exterior design, the final EIR did not have an opportunity to respond. Those written responses would describe the disposition of any significant environmental issues raised by commenters. (§ 21091, subd. (d)(2)(B).) "The requirement of a detailed written response to comments helps to ensure that the lead agency will fully consider the environmental consequences of a decision before it is made, that the decision is well informed and open to public scrutiny, and that public participation in the environmental review process is meaningful." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 904.) A final EIR's responses to comments are an "integral part" of an EIR's substantive analysis of environmental issues. (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 516-517.)

26

Due to the inadequate project description, those responses are missing because the late modification preempted commenting.

In all other respects, it is plaintiffs' argument that is deficient. Under CEQA, an EIR is presumed adequate, and the plaintiff has the burden of proving otherwise. (*Center for Biological Diversity, supra*, 36 Cal.App.5th at p. 243.) As set forth above in detail, the EIR described the project's impacts on the State Capitol Complex as a historic resource, determined they were significant, imposed mitigation measures, and concluded they remained significant and unavoidable. Plaintiffs' conclusory statements do not establish the analysis was otherwise deficient.

B.     Biological resources

Plaintiffs contend the EIR's analysis of the project's impacts on biological resources is inadequate. They limit their contentions to the EIR's analysis of the project's impact on Capitol Park trees and birds. They assert the EIR violates CEQA because it (1) does not include an inventory of plants and trees within the project boundaries but makes only vague and general comments about the impacts; (2) does not disclose how construction may damage remaining trees by compacting their root zones; (3) improperly relies on preparation of a future plan and the City of Sacramento's tree preservation ordinance to mitigate impacts to trees; (4) provides no substantial evidence that transplanting trees will be successful; (5) expands the project's boundaries to encompass additional trees that will be affected; and (6) does not evaluate how the project will expose birds to death by bird strikes.

1.     Impacts on trees

a     Background

The draft EIR identified the types of trees and plants that exist within the project boundary. It disclosed that the project would require removing an estimated 20-30 trees, but as many existing trees as possible would be retained during project construction.

27

The project could result in the loss or disturbance of trees owned by the City of Sacramento (City) and protected under the City's tree preservation ordinance. The conflict with the City's ordinance was a potentially significant impact. Pursuant to mitigation measure 4.13-3, DGS before construction begins will complete a survey of City trees on site and submit a tree removal and protection plan to the City arborist. The plan will identify the City trees the project will affect, and it will include planting techniques, maintenance regimes, success criteria, and a monitoring program for all City trees planted or retained on the project site. The plan will reduce the impact on City street trees to less than significant.

The draft EIR also stated that state-owned trees will be removed for the project. Removal will be minimized to the extent practical. State-owned trees are not subject to the City's tree preservation ordinance, and the EIR did not declare the impact on state-owned trees as a biological resource, as opposed to a historical resource, was potentially significant. However, prior to project implementation, DGS will complete a tree preservation and replacement plan for all state-owned trees the project will affect. The plan will require DGS to follow tree protection standards established by the California Department of Parks and Recreation for preserving, protecting, and caring for trees that will be retained. The plan will also include measures for replacing trees. Staging areas within the construction zone will be limited as necessary to protect trees.

The recirculated draft EIR's discussion of the project's impact on historical resources again estimated the project would require removing 20-30 trees. DGS will still implement tree protection guidelines from the Department of Parks and Recreation to protect trees retained in the construction area. However, as explained above, construction of the Annex and the parking garage could require removal of commemorative trees and plantings. Construction of the visitor center could also displace tree plantings that contribute to the West Lawn's historical significance. These changes contributed to the project's significant effects on the State Capitol Complex as a historic resource.

28

Mitigation measure 4.12-4d, which requires the implementation of the landscape treatment report, will mitigate this impact. But the impact to historical resources remains significant and unavoidable.

In the final EIR, DGS elaborated on the project's impact on Capitol Park trees based on the project's more-developed design. In total, the project would affect 133 trees: 10 trees will be transplanted on site, 18 trees will be transplanted outside the construction area but within Capitol Park, 56 trees will be removed and replaced with new trees in Capitol Park, and 49 City street palm trees will be transplanted along Capitol Park's perimeter. The new plantings and transplanted trees will be monitored for five years to ensure survivorship. If a new or relocated tree dies, it will be replaced in kind. A map identifies the trees planned to be transplanted and replaced, as well as 15 large dedicated and historic trees that will be protected in place.

DGS determined in the final EIR that the project modifications would not substantially increase the severity of the project's impacts on biological resources, including trees. Mitigation measure 4.12-4d as modified requiring the landscape treatment report would still be applied. Mitigation measure 4.13-3's requirement to submit to the City and implement a tree preservation plan would also still be applied and would bring the project into compliance with the City's tree preservation ordinance. No additional mitigation measures were required.

DGS will retain as many existing trees as possible during construction. It announced in the final EIR that instead of implementing tree protection guidelines from the Department of Parks and Recreation, it will implement American National Standard Institute (ANSI) A300 standards to protect trees retained within the construction area.

b.      Analysis

Plaintiffs first contend the EIR violates CEQA by not including an inventory of plants and trees within the project boundaries and by defining the impacts only vaguely.

29

Plaintiffs cite no statute, Guideline, or reported case law that requires an EIR to inventory or identify every plant and tree a project may affect. In *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, a panel of this court disagreed with plaintiffs' argument. We rejected an argument that an EIR for a large residential development in an oak woodland violated CEQA by not accounting for all oak trees that would be removed. In that case, the EIR disclosed the total number of trees on the site, the number that would be removed, the uses requiring removal, and the fact that the amount removed did not exceed a cap agreed to by the developer and the city. With mitigation, the impact remained significant and unavoidable. (*Id*. at pp. 229-230.) We concluded the analysis was sufficient to provide decision-makers and the public sufficient information. (*Id*. at p. 232.)

Here, the EIR provided a sufficient explanation of the trees the project will affect. (We will discuss below whether the disclosure of more information in the final EIR triggered the requirement to recirculate the EIR.) Viewed collectively, the EIR disclosed that the project would require removing trees, and it imposed mitigation measures to protect trees that will be retained in the construction area. It discusses the number and types of trees that will be affected, and it provides a map showing the location of trees to be transplanted or removed and replaced within Capitol Park. This information provided decision-makers and the public sufficient information to understand the project's impact on trees.

Contrary to plaintiffs' claim, the EIR acknowledges that construction activities may adversely impact retained trees, and it includes measures to mitigate the impact. Plaintiffs correctly note that the EIR does not explain how construction activities may damage trees by compacting the soil within their root zones. They rely on *Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645, 655-658 for support, which invalidated an EIR for a highway improvement project for not determining the significance of the project's impact on the root systems of a stand of old growth redwood

30

trees adjacent to the highway.  Plaintiffs cite the case as evidence that construction activities near trees can damage tree roots.  But the EIR acknowledges the potential impact to retained trees, and it contains measures to mitigate that impact.

Plaintiffs contend those measures are improper, as they rely on future preparation of a plan to determine what protections to provide impacted trees.  They also argue that mitigation measure 4.13-3, requiring compliance with the City's tree preservation ordinance, is not a sufficient mitigation measure.  They claim the EIR must consider whether the project may significantly impact City trees notwithstanding DGS's intent to comply with the City's tree ordinance.

CEQA, however, authorizes relying on a future plan as a mitigation measure so long as the lead agency commits itself to the mitigation, adopts specific performance standards the mitigation will achieve, and identifies the types of potential actions that could feasibly achieve that performance standard.  (Guidelines, § 15126.4, subd. (a)(1)(B).)  In addition, compliance with a regulatory permit or other similar process may be identified as mitigation if compliance would result in implementation of measures that would reasonably be expected to reduce impacts to the specified performance standards.  (Guidelines, § 15126.4, subd. (a)(1)(B).)

Here, DGS committed to a tree protection plan that will implement specific ANSI standards for protecting retained state-owned trees.  DGS under mitigation measure 4.13-3 also committed to complying with the City's tree preservation ordinance and its standards designed to reduce impacts to City trees.  These measures obligate DGS to meet certain performance standards, and they meet CEQA's requirements for future mitigation plans.

In addition, under mitigation measure 4.12-4d, DGS will develop a landscape treatment plan to protect and restore commemorative trees and other contributing landscape features in Capitol Park from construction impacts in accordance with National

31

Park Preservation Briefs and SOIS. This mitigation measure is not deficient under CEQA.

Plaintiffs' reliance on *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281 to support their argument that DGS must determine whether the project will impact City trees despite compliance with the City's tree preservation ordinance is misplaced in this instance. That case stands for the rule that a project's compliance with a regulatory standard does not foreclose consideration of substantial evidence showing the project will create significant environmental impacts. (*Id*. at p. 301.) That is not the issue here. The issue is narrower: whether compliance with a regulatory standard may be identified as a mitigation measure. CEQA is clear that it may.

Plaintiffs assert the final EIR exacerbates the EIR's problematic analysis of tree impacts by identifying historic trees to be transplanted without substantial evidence that transplantation will be successful, and by expanding the project size to encompass additional trees that will be impacted. Neither point has merit. Because transplantation will occur subject to ANSI and SOIS standards, the burden was on plaintiffs to show that transplantation will not be successful. They introduced no such evidence. As to the expanded project boundaries, the draft EIR recognized before the project boundaries were enlarged that City trees could be affected by the project, and it included a measure to mitigate that impact. Enlarging the boundaries did not change the impact or require different mitigation.

### 2. Bird strikes

Plaintiffs assert that the EIR's analysis of biological impacts is inadequate because it fails to evaluate how the project will expose birds, including protected bird species, to death by bird strikes. The final EIR acknowledges the new Annex design will incorporate more glass surfacing on the exterior of the building than is present in the

32

existing Annex, and that an "increase in glass surface area could increase the risk of bird strikes as the amount of glass on a building's exterior is typically the best predictor for bird strike risk (American Bird Conservancy 2015)."

The EIR states that a coating to be used on the Annex's glass exterior "involves a frit pattern . . . that reduces the likelihood of bird strikes by making the surface of the glass visible to birds (American Bird Conservancy 2015)." Additionally, it notes that studies have found that the use of fritting can reduce bird strikes by up to 94 percent.

Further, special-status bird species that may occur in the vicinity of the project site, such as Swainson's hawk or white-tailed kite, are not expected to have a high risk of colliding with the glass exterior. These species have high visual acuity, and, because they do not hunt small birds, they would not inadvertently collide with glass while chasing smaller birds. From this, the EIR concludes, "substantial avian mortality is not expected to occur and there would not be a substantial increase in the severity of impacts on birds."

Plaintiffs contend this analysis is inadequate because only half of the new Annex's glass will be equipped with fritting, leaving a huge expanse of glass that could still threaten birds. They claim the EIR's assertions lack supporting substantial evidence. Plaintiffs, however, make their arguments without citation to the record or supporting evidence. The EIR's analysis is supported by substantial evidence and adequately address this potential impact.

C.     Aesthetics, light, and glare

The EIR discussed three possible impacts the project may have on existing aesthetics, light, and glare: (1) the effect the new visitor center would have on the scenic vista of the Historic Capitol when looking east from Capitol Mall; (2) the effect the entire project would have on the existing visual character or quality of the site and its

surroundings; and (3) whether the introduction of new sources of light and glare would adversely affect day or nighttime views. It concluded the impacts were not significant.

Plaintiffs contend the EIR's discussion of each of these potential impacts did not adequately analyze the project's impacts on aesthetics under CEQA.

### 1. Background

#### a. Effect of visitor center on Capitol Mall vista

The view of the Historic Capitol's west façade when looking east from Capitol Mall is a protected scenic vista. DGS determined the new visitor center's impact on that vista would not be significant. The visitor center would be primarily below grade to minimize visual impacts, and the lower plaza would be designed to be deferential to the Historic Capitol and to maintain the west façade. The large skylight from the visitor center would protrude possibly "several feet" from the ground and be visible in front of the west portico. But it would be made of glass and largely transparent, and any obstruction to views would be limited to a portion of the portico steps.

Two safety railings would be visible. A safety railing would be built on the upper plaza surrounding the skylight. Another railing would protect visitors from falling from the upper plaza onto the lower plaza. The railings would be roughly waist to chest height and consist of closely spaced, vertical metal railing. DGS concluded any obstructions caused by the safety railings would be limited to the portico steps.

Two large-diameter planters would be placed on the upper plaza, one at each end of the portico. Each planter would contain a single tree. They would be sufficiently separated so as not to obstruct the view from Capitol Mall. Additionally, emergency exits would be installed on the visitor center's east end. They would consist of stairways leading up to ground level and exiting near the planter areas. Metal fencing would be installed around them to prevent unauthorized access.

The recirculated draft EIR included photographs of the current views of the Historic Capitol and the existing Annex, including photographs of the current view from Capitol Mall toward the Historic Capitol's west façade from the intersections of Capitol Mall at 9th Street and at 10th Street. The EIR also includes schematic representations of the proposed visitor center and entry plaza. However, it does not include representations of the view from Capitol Mall toward the Capitol after the project has been completed.

The recirculated draft EIR stated the visitor center's above-ground features would result in permanent, albeit minor, visual obstructions that could affect the views from Capitol Mall. It concluded that because these features would either have a relatively low profile and would obstruct views only of the portico steps, would be constructed of transparent material, or would be located to approximate current visual conditions, they would not substantially alter the long-distance views of the Historic Capitol from Capitol Mall, and the overall visual integrity of the Historic Capitol's primary façade would be retained.

b.       Project's effect on visual character

The project area's viewshed includes a wide mix of architectural styles from different eras. DGS concluded in the recirculated draft EIR that the project's impacts on the site's visual character or quality would be less than significant. The Annex was being designed to retain the Historic Capitol's general character and integrity. Its construction materials would be consistent with the Capitol. (This was prior to the announcement of the Annex's exterior design.)

Materials for the visitor center and the underground garage would be consistent with existing similar uses in the vicinity. They would be stable and durable, not prone to weathering or deterioration, and they would require minimum maintenance. The landscape design would maintain existing trees and vegetation to the degree possible. DGS would comply with the mitigation measures for trees discussed above. Any new

35

trees would include species consistent with existing trees in Capitol Park and with the City street trees.

Although it would significantly alter current conditions, the visitor center would be designed to be deferential to the Historic Capitol and to maintain the west façade. It is envisioned to be below grade to minimize visual impacts, particularly from Capitol Mall. The West Lawn's overall park setting would be retained, and the visitor center would not degrade the visual character or quality of the site or its surroundings.

DGS concluded that because the completed project would not result in the long-term degradation of visual character or quality, it would not substantially alter the aesthetic character of the project site or its surroundings. The impact was less than significant.

### c. New source of light and glare

The recirculated draft EIR concluded the project would not create a new source of substantial light or glare that would adversely affect day or nighttime views in the area. DGS stated the project would not include additional light sources beyond the types of lighting found in the current urban environment. Interior and exterior lighting and fixtures would be selected based on architectural aesthetic, efficiency, maintenance, and glare control.

The visitor center would have additional lighting at or near ground level, and there could be limited elevated lighting attached to trees and directed at ground level. That lighting regime would be consistent with the existing lighting on the project site. The skylight and light from the visitor center entrance viewed from Capitol Mall would be new sources of light, but this lighting would be of less brightness and intensity than the existing lighting used to highlight the Historic Capitol and its dome and would not detract from those structures' prominence. Nighttime lighting at the visitor center would be designed to maintain the emphasis on the Historic Capitol.

36

The Annex would emit an amount and intensity of light similar to the current Annex. Thus, the nighttime views from residential land uses would not be significantly affected, nor would the nighttime views of the Historic Capitol from Capitol Mall. The project also would not contribute substantially to sky glow effects generated by the community at large.

The project could increase daytime glare due to the new Annex's larger surface area, which could reflect or concentrate light. However, the project would avoid using materials that could generate substantial glare such as dark-tinted or highly reflective glass, painted wood, stucco, or field-painted ferrous steel or sheet metal. The project would also include a lighting plan consistent with the U.S. Green Building Council's LEED Green Building Rating System requirements for the new building to achieve at least the U.S. Green Building Council's LEED v4 Silver certification. Consistency with LEED requirements would reduce both the generation of exterior light and the potential for light trespass to affect off-site areas. The project would also be required to meet CALGreen standards that limit light and glare for State-owned buildings and reduce light pollution.

DGS concluded the impact was less than significant because the project would not create a new source of substantial light or glare that would adversely affect day or nighttime views in the area.

d.    Final EIR's analysis

The final EIR concluded that the new Annex's Double-T design and glass exterior and the parking garage's 12th Street alignment would not substantially increase the severity of the aesthetic, light, and glare impacts discussed in the recirculated draft EIR, nor would they create new significant impacts. The Annex would not adversely affect the Capitol Mall scenic vista because views would be shielded considerably by the Historic Capitol. The Annex also would be similar to the existing visual setting and

37

would not substantially degrade the visual character or quality of the site or its surroundings. Its aesthetics and materials would be consistent with SOIS and consistent and sympathetic with the Historic Capitol. It would continue to sit within a tree-filled park environment. The majority of the trees to the Annex's north and south would be retained and would continue to shield direct views of the Annex from L Street and N Street.

The glass exterior is also intended to be consistent with SOIS in providing a modern building that is consistent and sympathetic to the Historic Capitol. No black glass or mirror glass will be used. The pleated exterior and the frit pattern would decrease reflectivity to approximately 25 to 35 percent visible light out, meaning the glass would look either reflective or transparent depending on the time of day and other conditions. Between the frit-patterned glass and the exterior's bottom 36-feet not being made of glass, less than 50 percent of the glass exterior would be reflective. The final EIR includes renderings of the Annex and various views of it.

Moving the parking garage to the 12th Street alignment will not alter the project's aesthetic impacts, as it will continue to be underground.

The Double-T configuration, the pleated glass exterior, and the parking garage's new location will not alter the need for new lighting. The light sources will continue to be consistent with the U.S. Green Building Council's LEED v4 Green Building Rating System and will be required to meet CALGreen standards.

For these reasons, DGS concluded the project as modified in the final EIR will not substantially increase the severity of aesthetic, light, and glare impacts or create a new significance aesthetic impact.

   2.  <u>Analysis</u>

Plaintiffs contend substantial evidence does not support the EIR's conclusion that the visitor center will not significantly impair the scenic vista of the Historic Capitol from

Capitol Mall. They claim the finding is not supported because the visitor center will result in a large hole in the ground which will impact lower plaza elevations, and because no elevations, view simulations, or other means of evaluating the visual impact are provided in the EIR.

Plaintiffs also claim the EIR's finding that the project would be similar to the existing visual setting and would not substantially degrade the site's visual character or quality lacks supporting substantial evidence. The conclusion is allegedly not supported by analysis by someone such as an architectural historian; it is subjective interpretation.

Plaintiffs further contend the EIR does not meaningfully analyze the Annex's impacts on light and glare. Compliance with building standards does not automatically render impacts insignificant.

It is state policy under CEQA "to '[t]ake all action necessary to provide the people of this state with . . . enjoyment of *aesthetic*, natural, scenic, and historic environmental qualities.' (§ 21001, subd. (b); italics added.)" (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 936-937.) Under CEQA, the issue of aesthetics "is not the judging of the individual beauty of the [p]roject, but rather [the] physical elements of the preexisting environment the [p]roject may significantly impact." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 376.) Aesthetic issues "include impacts on public and private views and on the historic character of the project site and surrounding area." (*Preserve Poway v. City of Poway, supra,* 245 Cal.App.4th at p. 577.) Aesthetic issues also include the environmental impact of light and glare caused by a project. (See, e.g., *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1038; Guidelines, Appendix G.)

Here, the historic value of the State Capitol Complex, the importance of the view of the west façade of the Historic Capitol, and the importance of considering the impact of aesthetic changes on both cannot be overstated. Indeed, this value is reflected in

39

statutes that govern Capitol area planning. For example, the Legislature has declared that in formulating and devising long-range programs for the beautification of Capitol Mall with a Capitol Area Plan, "[t]here is clear justification and need for the creation of a beautiful and impressive western approach to the capital city of California, which coordinates and integrates the planning and development of all major elements in the immediate environment, and emphasizes the most important single structure in the complex, the State Capitol Building." (Gov. Code, § 8165, subds. (a)-(b); see also Gov. Code, § 8160.) Similarly, in adopting the Capitol View Protection Act, the Legislature found that, "Sacramento's State Capitol and Capitol Park provide the City of Sacramento with a unique cultural and open-space resource that is a major attraction for thousands of visitors each year." (Gov. Code, § 8162.6, subd. (a).)

Turning first to the aesthetic issues raised by the visitor center, DGS correctly states there is no express authority to support plaintiffs' argument that view simulations are necessary. Additionally, the recirculated draft EIR described and contained multiple photographs of views of the Historic Capitol from Capitol Mall and views of the Annex. According to DGS, together the recirculated draft EIR and the final EIR discussed the visitor center's design and location and included conceptual sketches of the visitor center, the Annex, and the grade view from Capitol Mall. The EIR concluded that because the visitor center will be constructed below grade, and the only above-grade structures will be relatively low profile, constructed of transparent materials, or located to approximate current visual conditions, it will not substantially alter the long-distance view of the Historic Capitol from Capitol Mall.

DGS, however, directs us to no representation in the EIR of the grade view of the Capitol from Capitol Mall once the visitor center is completed. The conceptual sketches in the recirculated draft EIR show a plan schematic looking above the visitor center, and a section schematic looking at the visitor center from the south, not from Capitol Mall.

40

Nothing in the EIR represents the view from Capitol Mall toward the Historic Capitol's west façade once the visitor center is constructed.

Although CEQA does not expressly require visual simulations, it does require that an EIR's analysis of a project's impacts include "enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.]" (*County of Fresno, supra*, 6 Cal.5th at p. 516.) Under the Guidelines, "[a]n EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences." (Guidelines, § 15151.) An EIR must include "summarized technical data, maps, plot plans, diagrams, *and similar relevant information sufficient to permit full assessment of significant environmental impacts by reviewing agencies and members of the public.*" (Guidelines, § 15147, italics added.) The level of specificity required of an EIR "is determined by the nature of the project and the rule of reason, not by any semantic label." (*North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 679.)

It is difficult to conceive of an instance where the nature of a project would dictate a greater degree of specificity and analysis of a project's visual impacts than this project with its significant effects on the Historic Capitol, the seat of state government. As stated earlier, a project's compatibility with a historical resource "is properly analyzed as an aesthetic impact." (*Protect Niles v. City of Fremont, supra*, 25 Cal.App.5th at p. 1134.)

In this instance, CEQA required the EIR to include a representation or rendering that would allow the public and decision-makers to understand and consider the view of the Historic Capitol's west side from Capitol Mall once the visitor center is completed. The visitor center, with its above-ground entrance ramps, open-air lower plaza, higher upper plaza, and a skylight and railings, and its modifications to the West Lawn's historic landscape will alter the scenic vista from Capitol Mall. Without a depiction of how the visitor center will alter the scenic vista, decision-makers and the public, those who did

41

not participate in the EIR's preparation, were without sufficient information to understand and consider meaningfully the project's impact on the vista. Although CEQA does not require technical perfection or an exhaustive analysis, it does require "adequacy, completeness, and a good faith effort at full disclosure." (*Eureka Citizens for Responsible Government v. City of Eureka, supra*, 147 Cal.App.4th at p. 372.) As with historical impacts, the project's impact on aesthetics cannot be understood unless the project is seen.

Next, we reject plaintiffs' claim that the EIR's finding that the project would not substantially degrade the site's visual character is subjective interpretation and not supported by substantial evidence. Contrary to plaintiffs' contention, nothing in CEQA requires the aesthetics analysis be performed only by an architectural historian or the equivalent. The analysis of aesthetic impacts is one of the more subjective areas of an EIR's impact analysis. (Kostka & Zischke, Practice Under the California Quality Act (2d ed. CEB), § 13.68 (Kostka & Zischke); see also *Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 363 ["Aesthetics are subjective"].) But individual complaints regarding a project's aesthetic merit do not constitute a significant adverse environmental impact. (*Eureka Citizens for Responsible Government v. City of Eureka, supra*, 147 Cal.App.4th at p. 376.) Plaintiffs bore the burden to show why substantial evidence does not support the finding, and they have not made that showing.

Plaintiffs' last aesthetics argument contends the EIR does not meaningfully analyze the Annex's impacts on light and glare. They contend that because the glass exterior design was not disclosed until the final EIR, the draft and recirculated draft EIRs do not analyze how light spillage from inside the Annex through the glass will impact its surroundings.

The final EIR states the project would be required to meet CALGreen standards which limit light and glare generated from state-owned buildings and thus would not create a new source of substantial light that would adversely affect day or nighttime

views.  Plaintiffs claim this conclusion is faulty because DGS's stated intent to comply with LEED building standards and CALGreen building standards does not excuse DGS from analyzing the project's impacts to determine whether they may be significant even if the project complies with those standards.

The current Annex is covered in reinforced concrete, with exteriors finished in granite, stucco, extruded aluminum, and cast aluminum details.  The EIR does not explain how light emitted from the current Annex and a glass Annex would be similar.  Moreover, "[a] regulatory standard [cannot] be applied so as to foreclose consideration of substantial evidence showing a significant environmental impact from a project."  (*East Sacramento Partnerships for a Livable City v. City of Sacramento, supra*, 5 Cal.App.5th at pp. 300-301.)  While commitments to use specific materials and comply with specific standards may serve as adequate mitigation measures, they do not inform the public and decision-makers how the light generated by the new glass Annex will compare to the light generated by the current Annex and how much that light may detract from the focus on the Historic Capitol or alter the aesthetics within the existing State Capitol Complex.

The aesthetics analysis of the project's impact on the Capitol Mall scenic vista and the Annex's generation of light due to the glass exterior did not satisfy the demands of CEQA.

D.    Traffic

Plaintiffs argue the EIR does not analyze adequately traffic impacts caused by the project once it is completed and during construction.

1.    Traffic upon project completion

Plaintiffs contend the EIR "assumes, without substantial evidence, that there will be no increase in Annex occupancy, and therefore, no increase in vehicle trips." Plaintiffs claim the assumption is not substantial evidence and cannot be supported

43

because it is unreasonable that a 62 percent increase in square footage will not result in an increased number of occupants.

Substantial evidence supports the EIR's statement, and plaintiffs' omission of the substantial evidence favorable to DGS on this point forfeits their argument. (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)

The substantial evidence is in the EIR. The EIR states, "The number of employees would not change as a result of . . . the new Annex." The draft EIR and recirculated draft EIR describe how the new Annex will serve the same purposes and house the same number of employees. The increased space will support "more and larger hearing rooms and conference rooms, more consistently sized office spaces, and more efficiently designed facilities." The new Annex will "enlarge corridors to improve flow and access," "allow equipment currently placed in hallways to be moved into dedicated offices," and "meet all current building codes [and] ADA standards." The final EIR notes this aspect of the project remains the same despite modifications to the project's design.

The project's objectives do not include providing space for more workers. They include providing an accessible and safe environment for workers, providing facilities that meet modern construction standards, and providing "meeting space for legislative and executive functions of sufficient size to support efficient performance of State business." These objectives are consistent with findings that the current building is in noncompliance with the Americans with Disabilities Act standards, has various safety code deficiencies, is overcrowded, and has insufficient public and working space. To argue the EIR is lacking because it fails to assume the new building will not be used consistently with its objectives is not reasonable.

In considering potential-growth inducing impacts of the project, the draft EIR again states the number of employees in the new Annex will not change. Additionally, "[n]o element of the proposed project would add new visitors to the Capitol.

44

Improvements to the Annex and the replacement of existing entrances with the visitor/welcome center are not the types of facilities that would result in people without prior plans to visit [the] Capitol to then decide to visit the Capitol because these facilities are now present."

This evidence is substantial evidence which supports the EIR's statement that the number of visitors and employees working in the Annex will not change due to the project.

### 2. Traffic during construction

To minimize impacts from construction-related traffic, the EIR requires DGS to prepare and implement a construction traffic management plan that must be approved by the City. Because DGS will implement this plan, and because construction-related traffic impacts will be localized and temporary, the EIR concludes that impacts from construction related traffic will be less than significant.

Plaintiffs contend the EIR is inadequate because (a) it does not analyze whether the required traffic management plan would be effective at reducing impacts, and (b) the fact that construction impacts are temporary—in this case five years—does not guarantee the impacts will be less than significant.

Substantial evidence supports the EIR's analysis and conclusions. Under the draft EIR's significance thresholds, impacts from construction-related traffic impacts would be significant if implementation, "degraded[ed] an intersection or roadway to an unacceptable [level of service]"; "cause[d] substantial inconvenience to motorists because of prolonged road closures"; or "result[ed] in substantially increased potential for conflicts between vehicles, pedestrians, and bicyclists."

The draft EIR discusses likely impacts on traffic due to the construction project and how the traffic management plan will mitigate those impacts. As required by City ordinance, the plan must be approved by the City's traffic engineer and is subject to

review by all affected agencies. It will be designed to ensure acceptable operating conditions on local roadways, pedestrian and bicycle facilities and transit studied as a part of the EIR and affected by construction traffic.

The traffic management plan will include descriptions of the amount and purposes of construction traffic, right-of-way closures and their duration, the use of posted warning signs and detour routes during closures, minimum distances from open trenches, and provisions for safe vehicular, pedestrian, and bicycle travel.

The draft EIR concludes that because construction-related impacts would be localized and temporary, and DGS would prepare and implement the traffic management plan, the project's construction traffic impacts would be less than significant. The final EIR states the construction-related impacts on traffic under the modified project would remain consistent with those described in the draft EIR.

Compliance with the City's traffic management plan ordinance is an acceptable mitigation where compliance would result in implementing measures that would be reasonably expected to reduce construction-related traffic impacts. (Guidelines, § 15126.4, subd. (a)(1)(B); *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 246.) Because the project requires DGS to develop the plan and have it approved by the City's traffic engineer, the EIR has identified alternative circulation routes, and the impacts will be temporary, substantial evidence supports the EIR's conclusion that construction-related traffic impacts will be less than significant.

E.    Utilities and service systems

Plaintiffs contend the EIR does not consider the project's long-term demand on utilities and service systems. They assert the EIR assumes that an increase in the Annex's size will result in no change in use of electricity, water, sanitary sewage, or solid waste disposal, or a reduction in impervious surfaces, and that the assumption is

46

unsubstantiated. The EIR must consider the long-term demand based on "a credible growth scenario." Plaintiffs claim this is particularly critical because the City's Combined Sewer System (sewer system) is over capacity, and the EIR does not analyze how the project may significantly over-tax the sewer system nor does it suggest mitigation measures or alternatives to mitigate impacts to the sewer system during significant storm events.

We have already concluded that substantial evidence supports the EIR's premise that occupancy and the number of visitors will not change. The recirculated draft EIR states that demand for water and wastewater is driven by the number of facility occupants and visitors. Plaintiffs offer no evidence to contradict this point.

Even though demand for services will not change, the EIR states that infrastructure with greater capacity may be required. Due to the Annex's larger size, current building codes may require existing water and wastewater infrastructure be replaced with larger pipelines. Electrical transformers will be replaced, and electrical service will be increased to provide additional power to the visitor center and the parking garage. Impacts from these improvements would be less than significant.

Water supply is not an issue. When completed, the project will demand an estimated 40.02 acre feet of water per year. This demand represents an estimated 0.03 percent of the City's surplus water supply, a less than significant impact.

The project's impact on solid waste facilities would be less than significant. Although the project will generate a similar amount of waste as the current building, 50 percent of the new Annex's waste will be recycled and diverted from landfills as required by statute. Local landfills have ample capacity over the next 50 years.

Stormwater management infrastructure will be updated to be consistent with existing codes. The project will include a drainage plan to capture stormwater generated by new impervious surfaces. A new on-site storm drain system will be built. Stormwater

47

will be collected on site and treated consistently with City requirements prior to being released to the sewer system.

The EIR acknowledges that the City's sewer system does not have sufficient capacity to treat wastewater and stormwater flows during storm events. However, with ongoing improvements to the system by the City, exceedance of capacity is a relatively rare event, less than once per year in the past 10 years. The EIR concluded the project's impact on wastewater treatment capacity was less than significant as the City continues to build improvements for the system, and DGS will pay its share of development fees for replacement of wastewater and stormwater infrastructure.

The EIR does not recommend mitigation measures for impacts on utilities and services, but that is because CEQA does not require an EIR to propose or evaluate mitigation measures or alternatives for impacts that are not significant. (Guidelines, § 15126.4, subd. (a)(3).) Substantial evidence indicates the EIR adequately addressed the project's long-term impacts on utility and service systems.

IV

*Analysis of Alternatives*

Plaintiffs argue that due to the changes in the project described in the final EIR, the EIR's analysis of alternatives was defective. It did not include an alternative plaintiffs argue would meet all the project's basic objectives and minimize the project's environmental impacts to the Historic Capitol's west side—moving the visitor center to the south side of the Historic Capitol where DGS originally planned to construct the parking garage. Plaintiffs claim the public had no opportunity to raise this alternative during the comment period because it did not become apparent until DGS moved the parking garage in the final EIR. Thus, CEQA's goals of public participation and informed decision-making were thwarted. Plaintiffs also claim that DGS did not

48

meaningfully consider renovating the existing Annex as an alternative due to its bias for the approved project.

A.      Background

The draft EIR evaluated the visitor center's impacts as the visitor center was originally designed for the Capitol's west side.  It concluded the visitor center's construction could contribute to the project's significant impact on the Historic Capitol due to the risk of damage from the new construction, but the center's entrance from an above ground structure would result in a very minor contribution to the project's significant impact on historical resources.

The draft EIR considered 11 potentially feasible alternatives that might avoid or lessen the project's adverse impacts, as the project was designed at that time.  It did not evaluate eight of those alternatives in detail as they did not meet the project's objectives and/or did not avoid significant environmental impacts.  The eight rejected alternatives each proposed changing one of the project's three components.  They consisted of constructing a fully detached Annex, constructing a smaller Annex and splitting functions with another state office building off site, not constructing a parking garage, not constructing a visitor center, renovating the existing Annex and constructing a new building to its east, constructing two smaller underground parking structures, providing the visitor center's functions in the Historic Capitol's basement, and constructing the visitor center on the eastern façade of the new Annex.

The draft EIR considered three alternatives in detail:  the required "no-project" alternative, fully renovating the existing Annex, and constructing the new Annex and the new parking garage with two underground levels.  Renovating the existing Annex would create similar or less impacts than the proposed project, but it would not provide sufficient space to accommodate all the proposed project's facilities and functions.  Building a new Annex and parking garage with two basement levels would also have

49

similar impacts as the proposed project with exceptions. This alternative would have greater impacts on geology and soils and on any as-yet-discovered pre-historic or historic archeological resources.

The draft EIR stated that the no-project alternative was the environmentally superior alternative, but in lieu of that option, renovating the existing Annex was the environmentally superior alternative. However, that alternative would not provide an Annex large enough to meet the project's objectives.

In the recirculated draft EIR, DGS considered the environmental effects of the visitor center's revised design. As explained above, and unlike the design analyzed in the draft EIR, the new visitor center design could create significant impacts to the Historic Capitol's west entrance and the West Lawn.

The recirculated draft EIR modified the original mitigation measures to mitigate the additional impact by requiring DGS to seek feasible means for salvaging character-defining features of the demolished portion of the West Lawn, but with mitigation, the proposed project's impact on historical resources remained significant and unavoidable. The recirculated draft EIR did not evaluate any additional alternatives to the project or to the redesigned visitor center.

In the final EIR, DGS further explained additional reasons to reject the two alternatives reviewed in the draft EIR. They would create significant and unavoidable impacts on historical resources because the Annex would either be physically altered or destroyed and, under both alternatives, the West Lawn would be modified to the point of potentially not representing its period of significance.

Also in the final EIR, DGS considered and rejected two additional alternatives which had been proposed in comments on the two draft EIRs. The additional alternatives involved renovating the existing Annex and constructing additional underground space to its north, east, and south; and moving the existing Annex to the east, rehabilitating it, and constructing new space between it and the Historic Capitol. The first new alternative

50

created additional environmental impacts and costs and did not meet project objectives. And although the second resulted in essentially the same impacts as the planned project, disassembling and rebuilding the Annex further away from the Historic Capitol was infeasible due to multiple design, construction, engineering, and structure challenges that would be cost prohibitive.

The final EIR considered no other alternatives.

B.      Analysis

CEQA requires an EIR to identify feasible alternatives that could avoid or substantially lessen the project's significant environmental effects. (§§ 21002, 21100, subd. (b)(4).) "[I]t is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects[.]" (§ 21002.)

The EIR must describe a range of reasonable alternatives to the project "which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project." (Guidelines, § 15126.6, subd. (a).) The EIR must evaluate the alternatives' comparative merits. (Guidelines, § 15126.6, subd. (a).)

An EIR need not consider every conceivable project alternative or alternatives that are infeasible. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163; Guidelines, § 15126.6, subd. (a).) Nor is it required to consider specific alternatives proposed by members of the public or other outside agencies. (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 420.) But it must consider "a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation." (Guidelines, § 15126.6, subd. (a).)

51

The range of alternatives is governed by a "rule of reason." (Guidelines, § 15126.6, subd. (f)(1).) This rule requires an EIR to set forth only those alternatives necessary to permit a reasoned choice. The alternatives are to be limited to ones that would avoid or substantially lessen any of the project's significant effects, and of those alternatives, the EIR need examine in detail only those alternatives that the lead agency determines could feasibly attain most of the project's basic objectives. (Guidelines, § 15126.6, subd. (f)(1).) The range should provide "enough of a variation to allow informed decisionmaking." (*Mann v. Community Redevelopment Agency* (1991) 233 Cal.App.3d 1143, 1151.)

We review whether the EIR's alternatives analysis complies with CEQA's procedural mandates and then decide whether substantial evidence supports the decisions made. (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 738.) Plaintiffs must show that the alternatives "are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives." (*Federation of Hillside and Canyon Assns. v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1265.)

We conclude the alternatives chosen did not contribute to a reasonable range of alternatives that fostered informed public participation and decision-making. The alternatives do not contribute to a reasonable range because the EIR did not consider an alternative that would feasibly attain most of the project's objectives while also lessening the project's significant impacts on the West Lawn.

The EIR considered three alternatives that would have moved the visitor center away from the Capitol's west side. However, as DGS states in its brief, the EIR "found none of them met project objectives and avoided significant effects." The "no visitor center" alternative obviously did not meet the project's objectives of providing a visitor center and simply duplicated part of the no-project alternative. The "no visitor center" and the "basement visitor/welcome center" alternatives would have created more

environmental impacts because the Historic Capitol would have to be modified to provide a covered security checkpoint at one of its entrances, resulting in increased impacts to the Capitol's historic architecture. And the alternative of constructing the visitor center on the new Annex's eastern façade did not satisfy project objectives because public access through the new Annex would reduce the accessibility, efficiency, and safety of state employees, elected officials, and the public.

Meaningful analysis of alternatives in an EIR requires an analysis of meaningful alternatives. The purpose of an EIR "is *not* to identify alleged alternatives that meet few if any of the project's objectives so that these alleged alternatives may be readily eliminated. . . . [T]he key to the selection of the range of alternatives is to identify alternatives that meet most of the project's objectives but have a reduced level of environmental impacts." (*Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1089.) The three alternatives affecting the visitor center did not meet this standard. None of them met project objectives while reducing environmental impacts.

This point became especially relevant when DGS modified the visitor center's design. Unlike the design considered in the draft EIR's alternatives analysis, the new design would significantly impact the West Lawn as a historical resource because it would materially alter the West Lawn's physical characteristics that convey its historical significance and justify its designation as a historical resource. (Guidelines, § 15064.5, subd. (b)(2).) No alternatives to the West Lawn visitor center were considered notwithstanding these significant effects.

DGS's method for selecting alternatives to be considered also thwarted informed decision-making and public participation on this project. The EIR concluded that the entire project would substantially impact historic resources. Yet DGS's method of considering alternatives to only one of the project's components prevented DGS from considering alternatives that would simultaneously address the entire project's significant

impact on historical resources while meeting most of the project's objectives. Decision-makers and the public were never given an alternative to the project as DGS had defined it.

Plaintiffs assert that moving the underground visitor center to the Historic Capitol's south side would meet project objectives and substantially lessen significant impacts to the Capitol's historic west façade and the West Lawn. DGS rejects this suggestion because, as it said in responses to comments, there would be no significant impacts to the Capitol's western *façade*. Ignoring the admitted impacts to the West Lawn, DGS argues an EIR need not consider an alternative that would not lessen a significant effect. But it can hardly be doubted that moving the visitor center to the south side would lessen the project's impacts on the West Lawn as a historical resource. And unlike the other visitor center alternatives DGS considered, the proposed alternative would also meet the project objective of providing a visitor center without affecting the Historic Capitol's historic architecture or the ability to have a modern Annex and a parking garage.

The analysis thus did not comply with CEQA's requirement that the EIR consider a reasonable range of alternatives. The omission of this alternative, especially after DGS modified the project in the final EIR to move the parking garage to the 12th Street alignment, prejudicially affected the EIR's range of alternatives by thwarting informed public participation and decision-making regarding alternatives that both met project objectives and reduced the project's environmental impacts.

As for the EIR's analysis of renovating the existing Annex as an alternative to demolishing it, plaintiffs contend DGS did not meaningfully consider renovation but included the analysis only to give the EIR an appearance of being legally adequate. Plaintiffs, however, do not challenge the sufficiency of the EIR's analysis. The EIR considered three renovation alternatives. The draft EIR analyzed in detail renovating the existing Annex. The final EIR analyzed two additional renovation alternatives: renovate

54

the existing Annex and construct additional underground office space around it; and move the existing Annex to the east, renovate it, and construct new space between it and the Historic Capitol. Plaintiffs claim the record shows that DGS was biased against these alternatives, but they raise no argument addressing how the EIR's analysis did not satisfy CEQA. Substantial evidence in the record indicates the EIR sufficiently analyzed the alternative of renovating the existing Annex, and that the public and decision-makers had a sufficient opportunity to comment on the proposal to demolish the existing Annex and the alternative of renovating it.

V

*Decision Not to Recirculate*

CEQA requires a lead agency to recirculate an EIR for public comment and consultation with other agencies when it adds "significant new information" to the final EIR before certifying it. Not recirculating such information deprives the public of a meaningful opportunity to comment on the new information. (Guidelines, § 15088.5(a); *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124-1125 (*Laurel Heights II*).)

We have already determined that the revised project description, the historical resource and aesthetics analyses, and the alternatives analysis did not satisfy CEQA. Because those issues will have to be addressed in a new environmental document on remand, we will consider here plaintiffs' remaining contentions of whether DGS should have recirculated the EIR upon the disclosure of the project's greater impact on trees and the project's enlarged boundaries.

A. Legal background

A lead agency is required to recirculate an EIR when it adds "significant new information" to the final EIR after giving notice of public review of the draft EIR but before certifying the final EIR. (§ 21092.1; Guidelines, § 15088.5(a).) The information

55

can include changes in the project or environmental setting and additional data or other information. (Guidelines, § 15088.5(a).) If a project changes before a final EIR is prepared, and the change is reflected in the final EIR, the lead agency must consider whether CEQA requires it to recirculate the EIR. (Kostka & Zischke, *supra*, § 16.15.)

Recirculation is required if the information added to the final EIR is "significant new information." New information added to the final EIR is not "significant" unless "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (Guidelines, § 15088.5(a).) Recirculation is not required when the new information "merely clarifies or amplifies the previously circulated draft EIR . . . ." (*Vineyard, supra*, 40 Cal.4th at p. 447; Guidelines, § 15088.5, subd. (b).)

"Significant new information" triggering recirculation includes, "for example, a disclosure showing that:

"(1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented.

"(2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance.

"(3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.

"(4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Guidelines, § 15088.5(a)(1)-(4).)

CEQA does not require the lead agency to make an express order or finding on whether to recirculate a final EIR. (*Laurel Heights II, supra*, 6 Cal.4th at p. 1133.) However, a lead agency's decision not to recirculate an EIR must be supported by substantial evidence in the administrative record. (Guidelines, § 15088.5, subd. (e).) We presume the agency's decision is correct. Plaintiffs bear the burden of showing that no substantial evidence supports DGS's determination that the new information disclosed in the final EIR was not significant new information. (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 330.) We resolve reasonable doubts in favor of the lead agency's decision. (*Laurel Heights II*, at p. 1135.)

B.     New information about impact on trees

Plaintiffs contend the final EIR disclosed a substantial increase in the severity of the project's impacts on trees and landscaping. As stated earlier, instead of removing 20-30 trees as stated in the draft EIRs, the project will require removing 56 trees and will affect a total of 133 trees. Plaintiffs assert that no substantial evidence supports DGS's determination that the increase in the number of trees to be removed does not qualify as significant new information of a substantial increase in the severity of an environmental impact which requires recirculation.

Plaintiffs also criticize the final EIR for relying on a cultural landscape evaluation of Capitol Park which DGS obtained for the final EIR but did not release to the public. Prior to the final EIR, a full cultural landscape evaluation of Capitol Park, identified as ICF 2020, was prepared to identify and evaluate further the Park's historic landscape features. This study inventoried existing trees and analyzed character-defining features associated with Capitol Park. DGS used the study to refine and confirm the impact analysis by identifying specific landscape features that contributed to the historic landscape and which the project will affect. DGS stated the study's results did not identify any new significant effects the project will have on the historic landscape or any

57

substantially more severe impacts from those already identified. It also did not alter the conclusion that the project will have a significant and unavoidable impact on historic resources or alter the consideration of feasible alternatives and appropriate mitigation measures.

Plaintiffs claim this landscape evaluation constituted significant new information which further triggered recirculation.

Substantial evidence supports DGS's determination not to recirculate the EIR based on the additional analysis of the project's impact on trees. Significant new information of a substantial increase in the severity of an environmental impact triggers recirculation unless mitigation measures are adopted that reduce the impact to a level of insignificance. (Guidelines, § 15088.5, subd. (a)(2).) The Capitol Park's arborist reported that approximately 850 trees exist within Capitol Park. 30 trees, the original projected of trees to be removed, are approximately 3.5 percent of Capitol Park's trees, and 56 trees are approximately 6.5 percent. It was reasonable for DGS to conclude that an increase of that magnitude did not constitute significant new information. The information merely amplifies the information disclosed in the previous EIRs.

There also is no evidence in the record that the cultural landscape evaluation was significant information establishing a new impact or increasing the severity of an impact. Plaintiffs cite to no authority holding the evaluation had to be released publicly. All CEQA requires when an EIR relies on data is a citation, a summary and analysis of the data, and a determination of the potential impact's significance. (Guidelines, § 15148.) The final EIR satisfied that standard. It cited to the evaluation, summarized and analyzed its findings, and determined that the new data did not disclose a new impact or a significant increase in the severity of an impact. Substantial evidence supported DGS's determination not to recirculate the EIR based on new information regarding the project's impacts on trees.

58

C.    Extending project boundaries for parking garage ramps

DGS extended the project's boundaries along N Street and L Street to accommodate entry and exit ramps for the underground parking garage.  It also extended a small portion of the project's east boundary to accommodate minor landscaping modifications.  The final EIR states that none of the disturbance areas in the additional project area contain habitats or other biological resources different from the park vegetation, walkways, and landscaping already identified as affected by the project.

Plaintiffs claim the final EIR's statement does not support DGS's determination not to recirculate the EIR because recirculation is triggered by project changes that exacerbate existing impacts.  Yet plaintiffs do not describe what impacts the boundary change exacerbated.

Recirculation is not triggered simply by worsening impacts.  It is required when a final EIR included significant new information of a substantial increase in the severity of an environmental impact unless mitigation measures are adopted that reduce the impact to a level of insignificance.  (Guidelines, § 15088.5, subd. (a)(2).)  Plaintiffs direct us to no evidence showing that extending the project boundaries substantially increased the severity of any environmental impacts or that the final EIR's analysis of the extensions' impacts was inadequate.  Substantial evidence supports DGS's decision not to recirculate the EIR due to the extensions of the project's boundaries.

VI

*Relief*

On rehearing, DGS asks us to direct the trial court to order only partial decertification of the EIR consistent with the CEQA violations we have identified.  This would halt those activities related to the portions of the EIR we found deficient while allowing arguably unrelated activities, such as demolition of the existing Annex, to proceed during remand.

59

CEQA "allows a trial court to leave project approvals in place. . . . CEQA does not require the court, on finding CEQA error, to void all project approvals." (*Central Delta Water Agency v. Department of Water Resources* (2021) 69 Cal.App.5th 170, 205.) If a court determines a public agency has not complied with CEQA, it must order or issue a peremptory writ of mandate requiring the agency to do one or more of the following: (1) void the project approval "in whole or in part;" (2) suspend any or all project activities that could prejudice consideration or implementation of mitigation measures or project alternatives necessary to bring the determination into compliance with CEQA; or (3) take specific action as necessary to bring the agency's consideration of the project into compliance with CEQA. (§ 21168.9, subd. (a); Guidelines, § 15234, subd. (a).)

The order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance if the court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice the agency's compliance with CEQA, and (3) the court has not found that the remainder of the project did not comply with CEQA. (§ 21168.9, subd. (b); Guidelines, § 15234, subd. (b).) A court may also exercise its equitable discretion to permit an agency to proceed with a project or individual project activities during the remand period. (Guidelines, § 15234, subd. (c).)

In its petition, DGS asks us to allow "non-violating activities" to proceed. It claims that numerous project activities that have already been scheduled to occur during the remand period are not related to the portions of the EIR we have determined are deficient. A project representative states that soft demolition of the existing Annex's interior is underway as allowed by this court. This involves removing all materials that are not part of the structure, its exterior façade, or basic egress points. This opinion does not affect soft demolition.

The representative testifies that if "current project activities" are allowed to proceed, "hard" demolition of the existing Annex is scheduled to begin in March 2023

and continue through mid-June 2023. Hard demolition is the complete removal of the building structure. Excavation for the new Annex and the parking garage was scheduled to begin in July 2023 upon completion of hard demolition. Excavation would likely finish around September 2023, and then work would begin on the concrete foundation for the new Annex and the parking garage.

DGS contends severance of these activities is appropriate here. It claims the severance criteria are satisfied because (1) only the portions of the EIR we found to be deficient will be included in the recirculated EIR and nonviolating activities can occur separately from the identified deficiencies; (2) severance will not prejudice its compliance with CEQA because there is no causal relationship between the CEQA-compliant portions of the EIR and the activities proceeding from those portions, and the deficiencies we have identified; and (3) we rejected the remainder of plaintiffs' arguments attacking the project's compliance with CEQA.

We agree with DGS in part. At issue is the extent to which DGS can proceed without prejudicing its ability to address the EIR's deficiencies regarding the new Annex's exterior design. We agree that proceeding with some project activities would not prejudice DGS's ability to address the EIR's defects concerning the Visitor Center's impacts on views and the analysis of meaningful alternatives to the Visitor Center's proposed location under the West Lawn. But because DGS denied the public an opportunity to understand and comment on the new Annex's exterior design and denied itself an opportunity to consider and address public comments, we must not allow any project activities to proceed that would prejudice DGS's ability to alter the Annex's exterior design should it decide to do so because of its new analysis. (§ 21168.9, subd. (b)(2).)

Any exterior design for the new Annex will require demolishing the existing Annex, and the impacts of demolition and renovation alternatives were already analyzed

61

in the EIR.  Thus, the parts of the EIR found deficient are severable from hard demolition of the existing Annex, and that project activity may proceed during remand.  However, all other project activities, including excavation for the new Annex and the parking garage and the beginning of work on the concrete foundations for those two structures, could prejudice DGS's review of the new Annex's exterior design.  As a result, those activities must be suspended during remand.

## DISPOSITION

The judgment is reversed to the extent it found that DGS had complied with CEQA and its findings were supported by substantial evidence with regard to the EIR's project description, its analysis of the project's impacts on historical resources and aesthetics, and its analysis of alternatives.  In all other respects, the judgment is affirmed.

The matter is remanded with directions to issue a peremptory writ of mandate directing DGS to vacate partially its certification of the EIR and to revise and recirculate the deficient portions of the EIR consistent with this opinion before it considers recertifying the EIR.  During the remand, DGS may proceed only with hard and soft demolition of the existing Annex.

Costs on appeal are awarded to plaintiffs.  (Cal. Rules of Court, rule 8.278(a)(3).)


_____

HULL, Acting P. J.


I concur:



_____

BOULWARE EURIE, J.


62

MAURO, J., Concurring and Dissenting.

I concur in the majority opinion except to the extent it concludes, in part III.C. pertaining to aesthetics, that the California Environmental Quality Act (CEQA)[1] required the environmental impact report (EIR) to include an additional representation or rendering of the view from Capitol Mall of the completed visitor center on the Historic Capitol's west side. The recirculated draft EIR's description and cross-sections of the proposed visitor center gave sufficient notice of the effects of the project on the scenic vista of the Historic Capitol so as to adequately inform and foster public participation and official decisionmaking.

As the majority opinion acknowledges, CEQA does not expressly require visual simulations of the project's effects. (Maj. opn. at p. 41.) Although an EIR must include relevant information sufficient to permit assessment of significant environmental impacts by reviewing agencies and members of the public (Cal. Code Regs., tit. 14, § 15147), an agency has considerable discretion in choosing the manner of EIR discussion (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515 (*County of Fresno*)). In reviewing an EIR, we determine whether it has sufficient detail to allow meaningful consideration of the issues raised by the project. (*Id*. at pp. 515-516.) But in doing so, we presume the EIR is adequate, and the party challenging the EIR has the burden to overcome that presumption. (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924-925.) We should be mindful that CEQA requires public agencies to carry out the EIR process in an efficient and expeditious manner (§ 21003, subd. (f)), and that it prohibits courts from imposing additional requirements beyond CEQA and the Guidelines[2] (§ 21083.1).

_____

[1] Public Resources Code section 21000 et seq. Undesignated statutory references are to the Public Resources Code.

[2] California Code of Regulations, title 14, section 15000 et seq.

1

In the recirculated draft EIR, Defendant Department of General Services and real party Joint Committee on Rules of the California State Senate and Assembly (collectively DGS) provided discussion and visual depictions that, taken together, notified the public and decisionmakers of the extent to which the proposed structures on the west side of the Historic Capitol would obstruct the scenic vista. The recirculated draft EIR acknowledged the "east-facing view of Capitol Mall toward the State Capitol is considered a 'protected view and vista.' " The recirculated draft EIR then discussed at length the effect of the new structures on the scenic vista. That discussion included the following descriptions of the anticipated impact:

"The new visitor/welcome center is specifically envisioned to be primarily below grade to minimize visual impacts, particularly from the Capitol Mall facing east. The top of the visitor/welcome center roof would be below the base of the west portico steps. Thus, full visibility of the Historic Capitol would be retained. . . . The skylight could protrude up to several feet from the ground and, thus, would be visible above ground in front of the west portico; it would be made mostly of glass and, therefore, would be largely transparent. Any obstruction to views of the Historic Capitol from the west would be limited to a portion of the portico steps. A second aboveground feature that would partially obstruct views of the Historic Capitol would consist of a safety railing on the upper plaza that would surround the skylight and a separate railing that would protect visitors from falling down from the upper plaza onto the lower plaza visitor/welcome center entry ramp; these safety railings would be typical of such features at a roughly waist to chest height and are intended to consist of closely spaced, vertical metal railing. Again, any obstruction to views of the Historic Capitol from the west would be limited to a portion of the portico steps. Additionally, on the upper plaza, single large diameter planters would be located to the north and to [the] south of the portico, each containing a single tree surrounded by low growing vegetation. The planters would be separated by a sufficient distance so that the trees would not obstruct the view of [the] portico when

2

viewed from Capitol Mall and, would in effect, frame the portico with trees similar to existing conditions. The planter height, thickness, and material would be appropriate for the edge of the planter to be used as seating, and therefore, would not be taller than the upper plaza safety railings described above. Finally, emergency exits would be installed on the east end of the visitor welcome center consisting of stairways leading up to ground level and exiting at the existing planter areas abutting the Historic Capitol north and south of the portico. Metal fencing would be installed around the ground level portions of the emergency exits to prevent unauthorized access. The design, materials, and color for the fencing would be consistent with the current setting and historic nature of [the] Capitol[,] thereby minimizing visual impacts and ensuring that long-distance views of the Historic Capitol are not substantially altered."

The recirculated draft EIR continued: "Construction of these above-ground visitor/welcome center structures (e.g., skylight, safety railings, planters, and fencing around emergency exits) at the foreground of the primary (western) facade of the Historic Capitol would result in permanent, albeit minor, visual obstructions that could affect long-distance views and the protected view and vista from the Capitol Mall toward the Historic Capitol. The State Capitol is a scenic landmark within the city of Sacramento, and the Capitol Mall corridor offers a unique view of the building by providing an uninterrupted view from Tower Bridge. Because the new above ground features of the visitor/welcome center would either have a relatively low profile and would only obstruct views of a portion of the portico steps, would be constructed of transparent materials (i.e., glass skylight), or would be located to approximate current visual conditions (i.e., upper plaza planters), they would not substantially alter the long-distance views of the Historic Capitol from Capitol Mall and the overall visual integrity of the Historic Capitol's primary facade would be retained."

In addition, the recirculated draft EIR also included a visual depiction of the proposed structures from above (the plan schematic), along with a cross-section of the

3

proposed structures looking from south to north (extending from 10th Street to the front portico of the Historic Capitol) (the section schematic). The plan schematic showed the locations of the visitor center, the available planter areas, and the emergency exits in relation to the portico. The section schematic showed the relative elevations in the line of sight from 10th Street to the portico, showing the levels of the street, the skylight, the portico steps, and the portico. The section schematic appears to suggest that while the level of 10th street might be lower than portions of the visitor center, the top of the skylight would be around the same height as the top of the portico steps.

By including the above-described discussion and visual plan and section schematics, the recirculated draft EIR provided significant detail about how the new structures would impact the scenic vista of the Historic Capitol. This was an exercise of DGS's discretion to decide on the manner of discussion, and it provided sufficient detail to allow meaningful consideration of the issues raised by the project. (*County of Fresno, supra*, 6 Cal.5th at p. 515.) Nothing more was required. Although DGS might have provided more detail regarding the vista, it did not abuse its discretion in this regard. With the information provided in the recirculated draft EIR regarding the impact on the vista, the public could intelligently comment on that portion of the proposal, and decisionmakers could adequately assess whether to approve that portion.

_____
MAURO, J.

4